Good morning, Your Honors. My name is Matthew Bishop. I represent the plaintiff appellant in this matter, North Idaho Community Action Network, or NICAN. If I may, I'd like to reserve five minutes for rebuttal. Thank you. I'd like to spend my time this morning, Your Honors, to discuss three issues that came up in the briefing. The first is that in terms of the NEPA compliance, let me back up a little bit. At issue in this case is the U.S. 95 highway project near Sandpoint, Idaho. It's a four-segment highway project. And at issue in this case is both compliance with NEPA and Section 106 of the Highway Protection Act. Section 4F of the Department of Transportation Act. In terms of NEPA compliance, I'd like to stress that this case is really unlike your typical highway projects, whereby the Department of Transportation prepares an EIS for the original design of the project and then uses its own reevaluation process to evaluate various additions and changes to the project. In this case, the DOT prepared a new EA pursuant to NEPA because the changes were so substantial. The Department of Transportation added a third southbound lane, chose to build a new bicycle and pedestrian pathway which will encroach on Sand Creek, built a new off-ramp and bridge, and decided to also build three artificial habitat areas directly in Sand Creek. And finally, I think it's important to stress that the new design in the EA adopts a completely new design for the project, taking it away from placing it on pilings, which was originally a two-lane design, and placing it on massive concrete walls, which will now be placed on fill. This is part of the reason the project is so controversial and why there is so much local opposition to this federal project. All these changes will change the environmental impacts originally envisioned in the EIS because now, to build the concrete walls and to build the pedestrian pathway, they're going to have to extensively dredge and fill Sand Creek, whereas before, there was no dredging and filling required, except for some minor stuff to place the pilings. Now we're talking about building a completely new shoreline that will have new impacts on Sand Creek. In addition, Your Honors, the new 30-foot-high massive concrete walls will create a visual barrier between downtown Sand Point, which is a picturesque waterfront area along Sand Creek, and City Beach Park on Lake Pend Oreille. So there's an enormous amount of local opposition, and this is really why it's so important in this case for the Department of Transportation to consider a reasonable range of alternatives in the EA, the environmental assessment, because unlike the minor design modification, which was at issue, for instance, in this court's Price Road Neighborhood Association case, where they had an interchange and they changed it from a tunnel to an off-ramp design, in that case, there was no environmental difference. In fact, the language from the case talks about how there was absolutely no discernible difference in the environmental impacts. Here, we're talking about dredging and filling Sand Creek, I think approximately 84,000 cubic yards of fill material, and a completely new design project. So in this case, it's extremely important for DOT to consider a reasonable range of alternatives, and they have yet to do that in this case. It's also important in the EA, and this is really another heart of the case here, is that it's extremely important for them to assess the impacts, because in the EA, for instance, they were well aware that they needed to dredge a new channel in Sand Creek to build the shoreline extension for the new concrete walls, but they never disclosed that in the environmental assessment to the public. It was never included in the EA, even though the record in this case reflects that they were well aware that they needed to do so. And I think that – What evidence would you point to support the argument you've just made, which I take it is that these agencies well knew that the dredging of Sand Creek would be necessary for the structural changes you described? Your Honor, I direct your attention to the briefing that lists a number of documents in the record, but I think one of the most helpful ones is Excerpt of Record 292, and it's a February 22, 2005 memo from DOT to the Idaho Department of Environmental Quality in which they say – and again, this is before they finalized the EA – they say, we prepared three alternatives for dredging Sand Creek in the vicinity of the shoreline extension in order to increase the hydraulic conveyance. They then reference Appendix 1, which includes, quote, a working drawing of the alternatives to, quote, assess the impacts. Again, this is a memo written to the State Department of Environmental Quality before the EA was finalized. There's additional correspondence from the Corps as early as October 14, 2004, stating – and I'm quoting – this is ER-287. This is to DOT. There appears to be dredging required to remove the temporary fills, execute a tow-trans to build bank stabilization, and dredging required by DEQ to construct the new low-flow channel. Again, I just want to emphasize that all this correspondence that was in the record indicates that, at the very least, that DOT was aware they needed to dredge a new channel, and the impacts of that decision, let alone the disclosure of it, was never included in the environmental assessment. Now, my understanding of the record – correct me if I'm wrong – is that Judge Lodge found against you on that point? That's correct, Your Honor. And there is – and he points to evidence, and, in fact, there is evidence to indicate that the dredging issue was a bit up in the air at the time the EA was issued, right? Yeah, Your Honor. I understand you say that the evidence you cited overwhelms that, but there is evidence on the other side of the coin, isn't there? I think there's evidence suggesting that they didn't have the detailed designs and drawings in place, but the ER 292 memo talks about how they did have some – they knew they were going to dredge, and they had what they called working drawings to assess the impacts, at least internally. They may not have had the specifics that they eventually included in the reevaluation, but at least at the time they did the EA, they were aware that they needed to dredge and that there would be impacts associated with that dredging, and we would contend that that would need to be included in the environmental assessment. Is there a separate permitting process with the Army Corps of Engineers? There is, Your Honor. And what environmental assessment does the Army Corps of Engineers have to take? Well, typically the Army Corps of Engineers does its own NEPA analysis for the issuance of the 404 permit, which would be the dredging field activity. In this case, however, the Corps has decided not to do their own NEPA analysis and instead adopt what the Department of Transportation has already done in this case. So what's issued in this case is the EA and EIS. When did the Corps make that decision? They made that decision when they issued the 404 permit, which DOT has filed a motion to supplement the record with. And that is now submitted to the court. I believe the decision was made in 2006, middle of 2006. So the concern really on our side is that the dredging activity has never been analyzed in a NEPA document up to this point. It's sort of fallen through the cracks. Just so both sides know, we entered an order this morning granting that motion. Okay. Thank you. And with respect to Judge Liza's decision, we would respectfully disagree. And with respect to this issue, we weren't aware of any citations that he made to the record to support the finding that the dredging was not known at the time they issued the EA, and we would contend respectfully that the record suggests otherwise. And I cited to various documents in the record showing that, at the very least, there was knowledge of the dredging activity, they knew they needed to dredge, and they did have working drawings of where they were going to dredge. What's our standard of review for the factual findings Judge Lodge made? Well, in this case, as you know, it's de novo review of a record review case. I get the question with the factual issues, whether or not there I believe is substantial evidence in the record. We have no evidence in the record of the fact that Judge Lodge did not have any evidence to support his conclusion, and we contend that that's not the case here. One final point I would like to make in terms of NEPA compliance is that we have now learned with the new decision document from the Corps that DOT is planning to fill up to over 5 acres of wetlands in Sand Creek, and approximately 11 acres total, open water wetlands, will be filled. We've been told all along. Is this in the record as supplemented? This is in the decision document that was the order you granted this morning, granted that. It's the first time we've learned of it. Again, you know, in the environmental assessment and in briefing, we've always been told there was no more than 2.8 acres of wetlands that would be impacted. Second, Your Honors, I'd like to touch on the 4F issues, two issues involving 4F compliance. First is the DOT's concession in briefing that they have not surveyed for, identified, or evaluated impacts to historic 4F properties in the remaining three segments of the project. In briefing ---- Is this the depot? No. Well, this is related. This is basically two 4F arguments we're making. One is that they didn't do the requisite surveys in the entire corridor, the other three segments, and the second argument involves the depot. I'll get to the depot in a minute. If I just may touch on this concession, we called it a fatal concession in our reply brief because the case law and the regs are very clear that the evaluation of 4F properties and whether or not the project, the highway corridor, will use the property has to occur before the record of decision is issued and while the alternatives are still under consideration. Counsel, the 4F inquiry apparently has been done for the Sand Creek segment. Is that correct? That's correct, Your Honor. And from looking at the maps, it wasn't entirely clear, but it looks to me like the Sand Creek is the principal urban segment of this project. Am I correct on that? That is true. There are some smaller communities just south of the Long Bridge area, at the stake of the Long Bridge, and just north of the Sand Creek byway is the town of Pend Oreille, but this is principally the downtown area standpoint. Just my experience as a citizen of the United States tells me that if we're looking for historical structures, that we would probably look at urban areas first. So what evidence is there of historic structures, or what can you just tell us is likely to be found in those other three segments? Well, interestingly enough, since they haven't done the surveys, we're not crystal clear on the precise sites that are there. We do know that, for instance, Nancy Rank, who's a local historian, submitted a declaration on our behalf, has talked about the Long Bridge itself being a historic structure that's potentially eligible for inclusion in the National Register. There are additional sites in an area they call the Sago Slough, which is the area that enters into the Long Bridge. There are old town sites down in that area as well. But again, the important thing here is that when we're looking for historic structures for 4F, that's not limited to things that are on the National Register. Is that correct? That's correct. It also includes areas that are eligible for inclusion in the National Register. The important thing under 4F is to make sure that if the highway project uses that sort of property, we're not saying they can't build the highway. We're just saying that they have to then do the requisite 4F analysis, which looks at alternatives and minimizing costs. It includes all sites that are currently on the National Register, and that's the depot. Well, there's a number of sites within what we call the Sand Creek Byway or the Sand Creek Alignment Segment. Yeah, there are a couple of others. The Sand Creek Segment is actually the original town site of Sand Point, and the depot is the last remaining structure. When you say historic sites, I want to make sure that we're precise on this, so that includes sites that are on the National Register, and does it include those sites that are eligible for inclusion? That's correct, Your Honor. Does it include anything else? Is there a broader definition? Well, in terms of historic properties, that's the extent of it. I understand there's another argument about a different section that relates to historic stuff, but at least with respect to 4F. That's right. You're talking about on the National Register or eligible for inclusion. That's correct, Your Honor. So here, I mean, I think what's struggling is that they issued the record of decision approving the entire highway segment, but they only looked at one segment, the Sand Creek Byway Segment, in terms of doing their 4F compliance. They didn't actually go out and survey, inventory, and assess the impacts of historic properties in the other three segments, and they now could see. It seems like it would be fairly easy to figure out whether there was anything else that was on the National Register that was in within those other three segments. I think it would be, yeah. I mean, I've heard you tell me that there actually is anything within those other three segments that is currently on the National Register. Well, they would need to consult with the State Historic Preservation Office to find that out. You haven't discovered anything on your own. You haven't driven the route and said, hey, look, here's a historic marker. No, no. You didn't include the old mill. No, I'm not qualified to do that, Your Honor. But we do know that there are historic old camping sites, potential mill sites, and the Long Bridge area itself that are included. And the State Historic Preservation Office has said, and this is evidence in the record, it's part of the 91 cultural resource overview, that they think there are a number of potential sites in these other three segments. But the real concern here is that they've already chosen the path. The corridor has been decided, and now they're sort of putting the cart before the horse and saying, well, in the future, before we start construction, we'll assess those areas for 4-F compliance. But the regulatory language, and even the case law cited by DOT in its briefing, is crystal clear that 4-F requires you to do those evaluations while alternatives are still under consideration. Okay. You're right at five minutes. Do you want to save it? Yeah, why don't I save that? Okay. Thank you for your argument. We'll hear from the agencies at this time. Ms. Ferguson. May it please the Court. I'm Deborah Ferguson. I'm an assistant United States attorney from the District of Idaho, and I'm here this morning on behalf of the Federal Highway Administration. My co-defense counsel, Mr. Murray Feldman, who represents Idaho Transportation Department and I are going to share our time, and we've divided our arguments. I'm going to handle the majority of the NEPA arguments. Mr. Feldman is going to talk more about project modifications and historic issues. In considering NICON's three primary NEPA arguments, I want to talk about the dredging analysis, the consideration of alternatives, and whether these project modifications rose to a level of significance that would trigger a supplemental environmental impact statement, yet another round of analysis. But before I engage in that, I would like to make note that the standard of review here for factual issues is a very high standard, and it is arbitrary and capricious. This Court recently articulated that again in the Lands Council's en banc unanimous decision. So that is our review of the district court's findings, or is that our review and the district court's review of the agency's findings? The latter. Okay. And so how do we review that? How do we treat Judge Lodge's findings? Do we get to review those de novo? Yes. Okay. First, I want to look at the dredging, and I think here in order to understand the dredging and the evolution of this project and the extensive analysis, you have to consider it over this timeline. When the project was first, the 1999 environmental impact statement, the selected alternative was approved, and the record of decision is there. So we have to start this morning with the understanding that that's an approved project ready to go. There was a, I think, rather remarkable collaborative process that then began with the record of decision in 2000 that went on for five years with the city of Sandpoint and those citizens to get input as to exactly how they would like to see this byway designed. There were committees that had numerous meetings. There were impact. I'm at a loss for words for the three. There were hundreds of citizens involved in trying to give input and refine this project. One thing that became really clear is that they would like the project to have somewhat of a lesser impact, and these eight design modifications, which Mr. Feldman will discuss, he can get into more detail there. Is it interesting when I heard your opposing counsel rattle those off, they almost sounded like environmentally friendly steps as opposed to damaging steps? I would agree, and in fact, ironically, I think these modifications reduce the impact and the footprint of the project. Certainly that would be true with the north ramp, which would be smaller in design. It would also be true with the bridge. Instead of having a larger, massive bridge with more pilings, it would be broken into smaller sections. So the project, as originally envisioned at the time of the EIS, went through public comment, input, public meetings, and the voice of the citizens was heard, and modifications were made to the plan, correct? Correct. Any part of those discussions include the dredging of Sand Creek? What became clear- I'll start with a yes or no. Yes. There were discussions involving where the public had input on the concept of dredging Sand Creek. Yes, and I would explain it this way. I would agree with plaintiffs' counsel that in the original project with the public involvement, the dredging was going to be limited to the placements of piers. Once the project was approved and the public participation came into the design phase, these enhancements that the public wanted were going to impact some wetlands and require mitigation. Most of the dredging that is going to occur, and it is really a rather small amount in the grand scheme of things, but it's occurring as mitigation measures to reduce impacts to wetlands. For instance, in order to have that green belt on the east side of the Sand Creek, there has to be some fill placed. Once the fill is placed, it narrows the stream channel. Well, that would increase the flow of the water. So dredging will occur in the creek to compensate for that so the stream flows are the same. So you have in this, the dredging that was needed is not discussed in detail in the 2005 EA, which details the design modifications. It's indicated that it would happen. It's indicated that it would happen with respect to the changes in the design and mitigation needed. But this process, as the Court's indicated, requires the Section 4 Army Corps of Engineers Clean Water Act permit. As this Court has acknowledged in the Carmel-by-the-Sea case, when we have a NEPA project that will affect wetlands, the 404 permit is required, and it's a substantive statute, the Clean Water Act. It's far more detailed and rigorous. So what happened? Before we get to that and before the thought flies out of my mind, I had understood coming into argument, and you correct me if I'm wrong about this, I had understood that the agency's position was that the dredging of Sand Creek was uncertain, didn't know if we would even do it, and therefore didn't require public comment. I now sense from your argument, and again, correct me if I'm wrong, that what you're saying is that we understood there would be some dredging, it's not too much, and it's being done for environmentally sensitive reasons. Which is it? The latter. The 2005 EA indicates that a permit will be required before anything can proceed, and that dredging, that there will have to be some dredging. The information was not available in 2005 to detail what came later in the reevaluation. And the reevaluation is, while very detailed and 106 pages long, is separate than the Army Corps permit and what they looked at and considered. And that was hardly a rubber stamp process. There was mention that the Army Corps of Engineers then, who had a NEPA responsibility, teared off to some of this NEPA analysis. So with respect to the dredging of Sand Creek, are we closer to Price Road or Idaho Sporting Goods? Price Road. Tell us why. Well, in Price Road, the Ninth Circuit approved the use of a reevaluation for project modifications. And I don't believe there would be any reason to conduct yet another environmental assessment. I mean, there were two. There was the original 204 and the revised one after more public input in 205. What was really considered in the reevaluation of 2006 was the additional information on the dredging. And when the court takes a close look at that reevaluation, you see most of that dredging is occurring in the four mitigation measures. In total, over 9,000 cubic yards are directly related to mitigation measures. Did the initial application to the Army Corps of Engineers indicate a belief that no dredging would be required? No. The project was always going to have some dredging because there would be the placement of the piers and the pilings. But there was a dialogue that then occurred once all of this community input was gathered and the modifications and the enhancements the community requested the agencies to build. The agencies said, well, you know, those are some great ideas, and they're the result of five years of input from the community, and we can design them. But before we move in that direction, we have to discern whether they would result in significant impacts that would trigger yet another supplement to this environmental impact statement. They did that revised EA and found that they would not. When further information then was disclosed about the very particulars of the dredging, you know, the exact amounts and the placement, that was then revealed in the 2006 EA. And even further dredging, this dredging was analyzed then in the Army Corps permit, which was ultimately issued last September. There are 10 minutes I want to turn over now. Let me make sure that this is going to fall in your call side of the fence, if you will, and that is questions about 4F. Is that in his bailiwick? Yes. Mr. Felden will handle that. Thank you for your argument. Thank you. Appreciate you coming in. Thank you, Your Honors. May it please the Court, I am Murray Feldman on behalf of the Idaho Transportation Department. Just initially to clarify one of the Court's questions, the agencies, the Transportation Department's initial application to the Corps of Engineers that's in the administrative record, that's a 2004 application, that did not address dredging. And that was one of the comments from the Corps. And the record is a little incomplete on this. There is, with the Court's order this morning, looking at the Corps' decision document on page 1 of the PSER, it notes that the application the Corps made its decision on was actually an August 3, 2006, permanent application. That was not part of the administrative record because it came at the time the record initially closed, at the time of the FHWA reevaluation decision. So there is correspondence in the record that notes this discussion about is there going to be dredging or not, some of the dialogue that NICAN's counsel has referenced. So there was a determination eventually after the EA that dredging would be required. ITD then withdrew the earlier dredge and fill, excuse me, fill, 404 permit application that was in the record, and then submitted a new application in August 2006 after the EA, when the information had been developed about dredging in sufficient detail to evaluate it, and submitted that to the Corps in August 2006. So did the initial application to the Corps say no dredging would be required? It did not address dredging. It only addressed the fill. Do you want to talk about 4F? Yes, Your Honors. 4F, there's two parts to NICAN's argument. One that they spent the most time on this morning is whether or not there was an adequate pre-rod survey done of historic resources. And the agency's position is that there was here. And it was an initial survey, a preliminary assessment, as the consultation with the State Historic Preservation Officer documents, and as the documents that are contained in the 1999 EIS show in Appendix B. But the agency's position is that was adequate at the time for the level of analysis and the level of decision that was being made. Did that cover all four segments? Yes, it did, Your Honor. It covered all four segments. It not only covered all four segments. It covered all of the action alternatives that were being considered. In other words, the ThruTown alternative, the Sand Creek Byway alternative, and the West alternative. And it did indicate that consistent with the Section 106 process, there was a review of historical documents. There were meetings and discussions with the SHPO, and that correspondence is in the record. And there was limited field investigation. And when we look at the Section 106 regulations at 36 CFR Part 800, it's consistent with what the agencies did here. They took the steps that were required to initially determine what historic resources might be out there to make that corridor-level decision. And I think the parties just disagree on the meaning of the cases. But, for instance, the Valley Community Preservation case from the Tenth Circuit looks at the City of Alexandria case from the D.C. Circuit and reaches the conclusion that was on construction of Interstate 70 there in Colorado, and they noted where there were significant prerecord of decision efforts to identify historic resources in the highway corridor, that was sufficient under Section 106, and that would be sufficient then for the 4F determination because that's how those 4F resources, as we're discussing with NICAN Council, are identified. The same process in Section 106, looking for those that are on the National Register or eligible for it. And so Valley Community Preservation there said when you've done a sufficient initial level of survey, you could follow up and identify the specific sites after the rod, and that's also part of the holding in the D.C. Circuit case of City of Alexandria. And then looking at this circuit's case in Sierra Club versus Department of Transportation in 1991 case, the court took a practical approach there. Now, that was the other side of the 4F coin. It was a use inquiry and not a survey inquiry, but I think applying that same practical approach here, what the National Historic Act regulations provide in a phased approach, the agencies satisfied their obligations here. And NICAN is incorrect in terms of saying there was any fatal concession here. All there is is a description of what was in the record, which acknowledges there was a preliminary assessment of the entire route. There was a determination of effect developed pursuant to Section 106, and that was documented in the record and that it was signed off on by the SHPO in 1992, and that is in Appendix B in the record in the FEIS. And the determination of effect covers what? It covers the determination of potential effect of each of the alternatives on historic resources. In all four segments? Yes, in the entire reach, the entire 7-plus-mile reach of the overall U.S. 95 project. Okay. I had understood NICAN's argument to be that you had, that is, the project has been winding down, that the real focus on historic elements had only been and was limited to the Sand Creek segment and that the other three segments had been ignored. Can you explain the divergence between your two arguments? Yes, that is their thrust. I think part of it you hit on before, Your Honor, and that is more of the historic resources and more of the research had been done in the developed areas and where the Sand Creek town site had developed. So more was, when ITD went to meet with the SHPO, more was known about that and more sites had been identified. But the research, and even we've pointed in our briefing, there are several potential sites noted in the cultural resources overview in the EIS that are south of the Pend Oreille River on the very south end of the project and that are north of the town of Sand Point. The regulation refers to the agency officials being able to use a phased process. Now, is the agency using a phased process here? Is there stuff that you've done with respect to the depot and to other properties within the Sand Creek segment that you haven't yet done for the other three segments? Yes, Your Honor. There is the detailed additional surveys and determination of effect and further consultation with the SHPO. The environmental assessment in 2005 documents how the phased approach was working for the Sand Creek byway section there and how there was the entry of the memorandum of agreement and further discussions between the agencies and the SHPO to identify those historic sites and what mitigation may be required, and that's how much of the mitigation for the depot had developed. So what work remains to be done for properties that are not in the Sand Creek segment? Those similar steps that are described in the EA for the Sand Creek byway. What steps? Identification of the area of potential effect, more detailed cultural resource surveys like were done for the Sand Creek byway segment, likely a memorandum of agreement with the SHPO on how to address the additional areas that will be identified, and then a determination of effect from the SHPO and implementation of any mitigation or protective measures. It sounds to me like the 4F has been done with respect to one segment but not others. Is that right? Well, the initial survey for potential 4F resources was done for all of the phases, but then the detailed follow-up has been done for the Sand Creek byway phase. Only? Yes. But importantly, that's the only phase that's proposed or funded for construction at this time. The others have not been funded or have a construction authorization from the Federal Highway Administration. Explain to us in practical terms what that means. You have four segments. You have one that's funded, one that's ready to go. Okay. Now, you build that. What happens to the other three segments? There has to be some level of further evaluation before they're authorized under the FHWA's own regulations, at a minimum because of the age of the FEIS and even the age of the 2005 EA now. The new situation would have to be re-evaluated before those could proceed, and likely there might be an environmental assessment at least on each of those phases. Do you have to do an additional EA before you can even construct those additional three segments? At least a re-evaluation and likely an environmental assessment. If you do that, if you do an EA, will you do the 4F inquiry at the same time? As was done with the Sand Creek byway. Would that be part of the EA? Well, it would actually be done before. As with the Sand Creek byway section, it's reported on in the EA. What allows you to do this one segment without having to do the other three? Allows agencies to build the one segment? Yeah. Oh, as the re-evaluation in the record notes, each of the segments has independent utility under this court standard for connectedness under NEPA. And so it also, as a practical matter, the Sand Creek byway segment is the one that solves most of the problems that agencies are trying to address. Is the state and the DOT then today here asking us to clear the Sand Creek project only and not all four segments? Well, we'd certainly appreciate it if the court would clear the Sand Creek. How can you clear the other three if you haven't done the 4F? Right. We're not saying that they're ready to go, the other three, and they're not funded. But you would be asking us to give you a get-out-of-jail-free card. Right. We're not asking the court to bless those other three. A 4F free card. Right, right, because we believe that the only segment truly at issue is the byway phase. And even the motions. Let me repeat my question then. So is the only segment that you are really asking us to approve today the Sand Creek segment? Yes, Your Honor. And I would believe that's all the motions panel enjoyed because that's all that was pending. So the other three segments are still open for additional work, have not yet been funded, and therefore would be subject to additional challenges in federal court and in this court. Based on the further decisions that need to be made, yes. We approved this today. We only approved the Sand Creek segment, and we don't approve anything else or approve rubber stamp the historic preservation work that's been done on the other three segments. That is correct. Okay. Thank you very much, Your Honor. Thank you. Rebuttal. Thank you. I'll try to keep this short. I'd like to start by saying that the record of decision in this case was the approval of all four segments of the highway project. And the EA itself addressed all four segments. Now, a lot of the additions and changes that we've been discussing today involve the Sand Creek byway segment. But DOT is not committing, at least in the record, to doing any further NEPA analysis on the other three segments. I thought I just heard them say that they would. At least I heard the state's counsel say that. Yeah. If we thought that our decision today were limited to approving the Sand Creek project, do you have any objections on the 4F? On the 4F, we do, Your Honor. And that was one of the issues I didn't get to, and I can briefly discuss, is that the depot issue is the last remaining structure in the Sand Creek byway. Let's suppose we disagreed with you on the depot question. If you disagree with me on the depot question, that is the only 4F issue we have. Okay. And so if you thought that you were still going to have an opportunity to protest 4F for the other three segments, that would resolve a lot of your concerns. If we had that opportunity, one concern I would have is that once you approve the Sand Creek byway segment and you construct it and build it, the other segments just bookend the Sand Creek byway segment, so it would be a foregone conclusion in terms of where the byways would be located. We understand they haven't yet been funded, that there's additional work to be done, and perhaps even an additional environmental assessment. So presumably you would have an opportunity to challenge the adequacy of any environmental assessment or to challenge the inadequacy if no environmental assessment were performed. I would agree, Your Honor. If you require them to do an additional environmental analysis for those other three segments, we would have the opportunity at that time to raise these concerns. At this point, though, we haven't seen any commitment. The ROD is for all four segments, and they may do an additional reevaluation, but that wouldn't give us, the public, any opportunity to raise these concerns. As you know, that's an internal decision document. It's not the same thing as an EA. It's really not an EIS. Well, when all of the arguments are done, we'll consider the entire record and make our decision. But just if we work to determine that it was only appropriate to deal with Sand Creek, we certainly have the authority to say that and bind the agencies, don't we? You do, Your Honor. I think in that case you would have to set aside the record decision, the FONSI, because, again, the emphasis has been on Sand Creek byway, but both of those decisions approve different other changes in other segments of the project as well. Can we approve the ROD insofar as it addresses the Sand Creek segment without having to approve it for everything else? I would say we approve the ROD in terms of 4F issues or in terms of- Well, let's suppose that we disagreed with you on the merits of your general NEPA objections. Well, I think in that case you would have the authority as the court to do as you see fit, and if that means approving the ROD or FONSI only with respect to Sand Creek byway, I imagine you would have the authority to do that. The opposing counsel does mention Appendix B in the FEIS, which is a 1991 cultural resource survey. I think it's important to point out that that was done for the draft EIS, and no changes were made, and it was included in the FEIS, and that document is so outdated that it actually envisions the removal of the depot altogether. And in the same document states, and I'm quoting, that extensive and highly significant historic and prehistoric resources are known to occur along the entire route, but up to this point we don't know because little investigation has occurred in this route. Is the depot being used at all now? It is. It's actually an active Amtrak railway station. And you may disagree with me on the use issue, but I think it's important to point out that they have never conducted an evaluation, a 4F evaluation, with respect to how the building of this project, Wall 95F, the lightweight fill structure, which will collapse the depot's sidewalk and curb and will need to be repaired, they have never done a 4F analysis of whether or not that activity will use the depot property. And they do talk about mitigation measures, but as the D.C. Circuit pointed out in the sensible transportation case, those mitigation measures only go to whether or not they comply with 4F-2, which says they have to minimize harm, not to whether they can avoid 4F altogether, which is what they're trying to do in this case. Okay. And I'd like to just use my remaining 30 seconds to briefly point out that the 11 additions and changes really do not reduce the impacts. In fact, it's quite the opposite. Before, there was no dredging and filling except for minor pier work. Now we're talking about 84,000 cubic yards of dredging fill, new channels, new shorelines, and removal of mature trees and riparian vegetation along Sand Creek's eastern shoreline. And that's a significant change that we believe warrants a new NEBA document. Now, that could be we think the significant factors are met. It should be a new EIS, but I don't want to get caught up in semantics. I think a new EA would suffice as well. Okay. All right. Thank you for your argument. Ms. Ferguson, would you step up for just a minute? Yes, sir. You heard your co-counsel's statement on the record about seeking relief for the Sand Creek project leg segment phase only. Is that the position of your client? No, Your Honor. What's been analyzed is the entire north-south project, all four phases. What we're trying to proceed with is the very first phase, and the additional analysis has been done. It's by far the most complicated of the phases. The other three are simply laying new highway over an existing alignment. What's your position as to whether this court has to limit, has jurisdiction authority power, if you will, to limit approval to the Sand Creek leg only? Your Honor, what the agencies have made abundantly clear, and they have in the 2005 EA, if I could just. Thank you. In their conclusion, they said, if appropriate additional resource evaluations will be performed on a phase-by-phase basis to provide adequate analysis of potential resource impacts, at such time appropriate clarifications, evaluations, and documentations will be completed to identify and assess changes, new circumstances. You've now told me what your client plans on doing. My question to you, as a lawyer representing them, is whether you think this court has the authority to limit approval to the Sand Creek phase only. The stay that's imposed is for the Sand Creek phase only, and certainly I believe should be lifted. What I would hate to see happen is this underlying environmental impact statement that approved the four phases of the project be somehow voided out. I don't think we should have to start from scratch there. I think what the agency has to do after the first phase is built is to look at their second phase and decide what it needs to do to make sure everything is current. You also heard your co-counsel tell us that the 4F inquiry apparently hasn't been completed for the other three phases, so there's additional work. Absolutely. That you're telling us has to be done. Absolutely. And therefore, you're not asking us to approve the entire project from start to finish today? That's correct. It is not ready to proceed for construction. The only segment that's really ready for our approval is the Sand Creek segment. That's correct. So is that all you're asking us to approve at this time? Yes. Okay. And so the other segments have yet to be funded. There may be some additional work, which may or may not result in an environmental assessment, but probably will require some additional 4F work. As a certainty, I would say the 4F work and also the environmental re-evaluation. The Federal Highway Administration would be required at the minimum to do a re-evaluation. For the other three segments? Yes. So we do not have to approve those segments today? That's correct. But because the initial rod and the final environmental impact statement in 1999 is already completed, I wouldn't want the order to somehow infer that those phases, that foundation and that groundwork of analysis that's been done for them is somehow inadequate. What needs to be done if they're going to proceed on this phase approach, the agencies have said, you know, we're going to look at each phase as we do it and make sure it's current. How can we approve? What is it that we can approve with respect to the other three projects if you haven't completed your work? The record of decision in 2000 approved the 1999 environmental impact statement for the entire north-south project. Right, but we now know that some additional work may have to be done and that at least the 4F stuff will definitely have to be done. Absolutely, yes. So how could we possibly approve something that's incomplete? Well, the agency has been made clear, the rod makes clear that the analysis won't stop there. What we're asking for today, yes, is permission. We don't usually approve agency orders that say we're going to do X, Y, and Z and any other neat stuff we decide to make up in the future. I think that the agent, that the court could approve, lift the stay and allow the bypass project to proceed and we can leave the other three phases for another day. They may or may not be challenged in litigation. I mean, ideally the But leaving them for another day would mean that NICAN or any other interested community environmental advocacy group could challenge. Yes, of course. And would not be foreclosed from raising any and all challenges. They would not. And we would stand ready then to address and defend that analysis. I think we understand your argument. Thank you. I want to thank both sides for coming in today. It's a very complicated case. It was very well briefed and argued. We really appreciate it. The case just argued will be
judges: Nelson, Hawkins, Bybee